[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-11252
Non-Argument Calendar
_____

D.C. Docket No. 1:11-cr-20447-CMA-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ELIEZER LAZO,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 15, 2012)

Before BARKETT, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Eliezer Lazo appeals his total sentence of 63 months' imprisonment imposed after he pled guilty to two counts of engaging in monetary transactions in criminally derived property, in violation of 18 U.S.C. §§ 1957 and 2; seven counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2; and six counts of structuring to evade reporting requirements, in violation of 31 U.S.C. § 5324(a)(1), (d)(2), and 18 U.S.C. § 2.   On appeal, Lazo argues that the district court committed procedural error when it applied a four-level increase to his offense level, pursuant to U.S.S.G. § 2S1.1(b)(2)(C), based on its determination that he had engaged in the money laundering business.  Lazo contends that the enhancement was intended to apply to someone whose livelihood depended on laundering others' money, whereas he only conducted the money laundering transactions over a short period of time.  Lazo further argues that the government failed to provide evidence demonstrating that Lazo himself received money for engaging in the transactions.  For the reasons set forth below, we affirm Lazo's sentences.

## I.

The presentence investigation report ("PSI") provided that Lazo's co-conspirator, Elizabet Lombera, used companies that she controlled, including Mercy Medical Supply, Inc. ("Mercy") and JHH Group, Inc. ("JHH"), to commit

healthcare fraud.  Several individuals, including Lazo, laundered the funds derived from the fraud on behalf of Lombera and her companies.  Over a 4-month period, between October 3, 2007 and January 28, 2008, Lazo received approximately 50 checks from Mercy and JHH, totaling $476,133.69, which he deposited into a personal checking account at Bank of America.  Over a two-month period, between October 5, 2007 and December 3, 2007, Lazo made numerous cash withdrawals from his account.  The PSI indicated that Lazo was a self-employed truck driver from 2001 to 2009, earning between $800 to $1,000 a week.

The PSI calculated a base offense level of 22, pursuant to U.S.S.G. §§ 2S1.1(a)(2) and 2B1.1(b)(1)(H), because he was responsible for laundering more than $400,000, but less than $1,000,000.  A four-level increase applied, pursuant to U.S.S.G. § 2S1.1(b)(2)(C), because Lazo was in the business of laundering funds.  Based on a total offense level of 26 and a criminal history category of I, Lazo's guideline range was 63 to 78 months' imprisonment.  Lazo objected to the PSI's application of a four-level increase to his offense level, pursuant to § 2S1.1(b)(2)(C), arguing that he was not in the business of laundering funds and that none of the six factors in the commentary to § 2S1.1 applied to him. *See* U.S.S.G. § 2S1.1, comment. (n.4).

At the sentencing hearing, the government had Zachary Crutchfield, a

3

special agent with the Federal Bureau of Investigation, testify in support of the § 2S1.1(b)(2)(C) increase. Crutchfield testified that he had reviewed Lazo's bank account, and Lazo had deposited 48 checks totaling $365,530.42 into that account from Mercy and 12 checks totaling $110,603.33 from JHH. Lazo's account had a total of $503,161 withdrawn. In a prior interview with law enforcement, Lombera had stated that she paid individuals 10 percent of the amount of a company check that was turned into cash, which, in Lazo's case, would be a commission of $47,613.38. Crutchfield further testified that every withdrawal from the account occurred at a different branch of the bank. On cross-examination, Crutchfield testified that there was no evidence that Lazo had, in fact, received from Lombera ten percent of the amount he cashed. In response to a question from the court, Crutchfield testified that Lazo went to different branches of his bank to deposit the fraudulently-obtained funds on 28 different days during a 4-month period. During that same period, he also went to the bank 36 other times, on 18 different days, to withdraw the funds from the account. Crutchfield noted that Lazo had a business of training baseball players in Mexico, but it was not active at the time of the fraud.

The court found that, over a 4-month period, Lazo visited branches of his bank 16 times a month, which was "practically every business day," performing

4

services for Lombera.  The court rejected any assertion that Lazo did not receive anything for his services and determined that the increase applied.   Thus, following the court's application of a 2-level reduction for Lazo's acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), Lazo had a guideline range of 51 to 63 months' imprisonment.  The court considered the 18 U.S.C. § 3553(a) factors and determined that the offense was "extremely serious" and that deterrence was needed.  The court then imposed a total sentence of 63 months' imprisonment.

## II.

We review a district court's factual findings for clear error and, in most cases, review a district court's application of the Guidelines to the facts with due deference, which is equivalent to clear error review.  *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010).  There is no clear error in cases where the record supports the district court's findings.  *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002).  A district court's choice between two permissible views of the evidence is not clearly erroneous.  *United States v. De Varon*, 175 F.3d 930, 945 (11th Cir. 1999) (*en banc*).  Facts contained in the PSI that are not objected to are deemed admitted.  *See United States v. Bennett*, 472 F.3d 825, 833-34 (11th Cir. 2006).

5

Section 2S1.1(b)(2)(C) of the Sentencing Guidelines provides for a four-level enhancement if the defendant was "in the business of laundering funds." The guideline commentary to § 2S1.1 instructs the court to look to the totality of circumstances to determine whether a defendant was in the business of laundering funds. U.S.S.G. § 2S1.1, comment. (n.4(A)). The commentary lists six non-exclusive factors for this analysis: whether (1) the defendant regularly engaged in laundering funds; (2) the defendant laundered funds for an extended period of time; (3) the defendant engaged in laundering funds from multiple sources; (4) the defendant generated a substantial amount of revenue in return for laundering funds; (5) the defendant had a prior conviction for a money laundering related offense; and (6) the defendant made statements during the course of an undercover government investigation that he had engaged in any of the conduct listed in factors (1), (2), (3), or (4). U.S.S.G. § 2S1.1, comment. (n.4(B)(i)–(vi)). Section 2S1.1(b)(2)(C) was added to the Guidelines based on a determination that, similar to a professional fence, defendants who routinely engaged in laundering funds on behalf of others and gained financially from such transactions, warranted substantial additional punishment because they encouraged the commission of additional criminal conduct. U.S.S.G. App. C, Amend. 634, Reason for Amend.

The district court did not clearly err in finding that Lazo was in the business

6

of laundering funds, such that the four-level increase applied, pursuant to § 2S1.1(b)(2)(C).  First, Crutchfield's testimony at the sentencing hearing demonstrated that Lazo visited different branches of his bank 64 times during a 4-month period to either deposit or withdraw the fraudulently-obtained funds in furtherance of the money laundering scheme, and thus, the district court could conclude that Lazo regularly engaged in laundering funds during the relevant time period.  Next, Crutchfield testified that the others who laundered money for Lombera received ten percent of the amount that they had cashed.  As Lazo was a truck-driver at the time he was engaging in these financial transactions, making $800 to $1000 a week, the district court did not clearly err in concluding that Lazo would not engage in numerous transactions at different branches of his bank without receiving compensation similar to that received by the other co-conspirators who laundered money for Lombera.  Crutchfield testified that 10 percent of the $476,133.69 that Lazo admitted to having laundered was $47,613.38.  This was a substantial amount of revenue for Lazo at the time of the offense.  Third, although the funds generated were all connected to the healthcare-fraud scheme, multiple companies, Mercy and JHH, provided Lazo with checks to cash, and thus, the funds came from multiple sources.  Based on the totality of the circumstances and at least three of the six factors being satisfied, the district court

7

did not clearly err in finding that Lazo was in the business of money laundering, such that the four-level increase applied. *See* U.S.S.G. § 2S1.1, comment. (n. 4(B)(i)-(vi)).

For the foregoing reasons, we affirm Lazo's sentences.

**AFFIRMED.**